# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CC-00665-COA

**CORR PROPERTIES, LLC**                                        APPELLANT

**v.**

**CITY OF OXFORD, MISSISSIPPI**                                  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/06/2024 |
| TRIAL JUDGE: | HON. KENT E. SMITH |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | HANNAH KATHERINE HERRIN |
| ATTORNEYS FOR APPELLEE: | PAUL BOWIE WATKINS JR. |
| | POPE SHANNON MALLETTE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 08/26/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LASSITTER ST. PÉ, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     The City of Oxford denied a zoning variance application that would have permitted private property owners to erect an unmanned guardhouse in the middle of a public street near the entrance of a residential neighborhood. The Circuit Court of Lafayette County affirmed the City's decision. On appeal, the applicants argue that the City's denial of the special variation was arbitrary and capricious. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

*Grand Oaks Planned Unit Development*

¶2.     Grand Oaks is a six-hundred-acre planned unit development in the City of Oxford. In addition to residential streets, the neighborhood contains the Oxford Country Club. The

streets in Grand Oaks are public streets owned and maintained by the City. The main entrance to the neighborhood is near the intersection of Industrial Drive and OUS Drive, with close access to Highway 7. The properties lining Industrial Park Drive before the road enters the residential zoning area and becomes Clubhouse Drive include self-storage facilities, a medical supply company, and the Oxford Police headquarters. The development originally had only one access point. However, partly to facilitate multiple points of access for city emergency services, a second entrance was opened on Morris Drive with close access to Highway 334. Following the addition of this second access point, through traffic significantly increased in the neighborhood, particularly on Clubhouse Drive and Fazio Drive.

*Special Variance Requests*

¶3.     In 2022, a Grand Oaks property owner and a developer (collectively "Corr Properties")[1] submitted an application to the Oxford Planning Commission seeking a special variance to install a gate across Morris Drive at the Bell River Road entrance to Grand Oaks.[2] The proposal diagram noted that "Clubhouse Dr. and Fazio Dr. were not designed for HWY use" and that the proposed gate would be an "electric gate for homeowners to utilize via card/passcode. Prevents through traffic from Hwy. 7 to Hwy 334." Additionally, the application sought permission for the construction of an unmanned guardhouse near the intersection of Clubhouse Drive/Industrial Park Drive and OUS Drive. The application

---

[1] The property owner described himself as "the owner of Corr Properties" LLC.

[2] A similar application was filed in 2017.

included letters of support from 102 residents who detailed an increase in criminal activity, including a child kidnapping attempt and suspicious vehicles casing houses. The stated purpose of the proposed structures was to "prevent cut-through traffic, speeding, vandalism, and other threats to the safety of Oxford citizens." The Planning Commission did not move the application forward.[3]

¶4. In 2023, the same parties submitted an application to the Oxford Planning Commission, renewing the request to construct the unmanned guardhouse in the middle of Clubhouse Drive pursuant to the City's Land Development Code section 7.2.9.8(g), which authorized a special variance for "ornamental structures." The applicants proposed to pay for the project, which would include widening the road, relocating bike lanes and the sidewalk, relocating a gas line, possibly relocating utility poles, and establishing utilities to the structure.[4] The application stated that the structure "is intended to be an additional security feature to the neighborhood as a traffic-calming measure" and incorporated by reference the previous letters of support from residents.

¶5. The planning commission staff prepared comments recommending denial of the requested special exception.[5] Regarding the land development code section 7.2.9.8(g),

[3] The Commission noted state law restrictions on obstructing public roads. *See* Miss. Code Ann. § 65-7-7 (Rev. 2021).

[4] The neighborhood homeowners' association did not comment or participate in any of the proceedings. At one of the public hearings, a resident speculated that the HOA might play a role in maintaining the guardhouse in the future.

[5] The comments recommend that if the application were granted, it should be

3

pertaining to "ornamental structures," the comments stated:

> Staff believes that this provision exists for Residential Common Interest Developments that may want to dress the entrance into the development with a fountain, a pergola, or other structure that may be located on private or common area property. The spirit of this provision in the Land Development Code was not necessarily intended for a structure to be located in the middle of a City street.

The comments noted that the proposed 10 x 10 structure would have two operable doors and that the "plans do not illustrate if the operable doors will open into the roadway[,] but that can present safety concerns. It also presents the question that if this is intended to be an unmanned guardhouse, why is there a need for two operable doors?"[6] Concerning utilities, the comments note that the "proposed location of the structure is situated on top of an existing sewer line. This location presents its own set of challenges if there becomes an issue with the sewer line requiring repair."

¶6.    Addressing the guardhouse's proposed function as a traffic-calming measure, the comments stated that it "is unclear how this structure will provide much traffic calming while it is located within approximately 50' of a three-way intersection" and suggested alternative traffic-calming measures, such as increased radar enforcement and police patrols. The comments also noted that the Oxford School District owns fifteen acres of property within the area that would "continue to bring people that have no association with the neighborhood

conditioned on receiving a revocable license from the City, an indemnity agreement holding the City harmless, and a site plan review.

[6] The diagram for the proposed structure is labeled: "Site Plan for Grand Oaks Gate House."

4

to the club to this part of Grand Oaks."

¶7.    The Oxford Pathways Commission reviewed the proposed structure for compliance with the City's "Complete Streets Policy" and voted 4-1 that the commission had no objection. One commissioner expressed concern that the structure might "deter people from walking, running or biking because they think that the road [is] not open to the public."

*Planning Commission Hearing*

¶8.    The Planning Commission held a public hearing on the application. Several residents spoke in support of the structure, detailing concerns about increased through traffic and criminal activity. Residents described specific instances of criminal or suspicious activity near their homes, and several residents expressed explicit support for eventually gating the community. The Commission considered (as part of the record) an objection letter from Will Townes, the Pathways commissioner who voted against the project. Members of the Commission expressed concern about deterring access to public roads.

¶9.    The Planning Commission denied the special variance application by a unanimous 6-0 vote. A commissioner stated that the neighborhood should first exhaust alternate measures to accomplish the objectives of traffic calming and increased security, and only then should it return to the Planning Commission with the request for the unmanned guardhouse. The commissioner further noted that it "is a very strange request in terms of the Land Development Code, partly because it looks like we're trying to obstruct a public road, partly because it looks like we're sort of in a run towards a gated community where it is a public

5

road. There are mechanisms for there to be gated communities in Oxford, but they don't involve public roads."

*Appeal to the Board of Aldermen*

¶10.    Corr Properties appealed to the Board of Aldermen, arguing that "the applicants' special exception request complied with the City's Land Development Code and the project is in the public's interest. As such, the decision of the Planning Commission was arbitrary and capricious and was not supported by substantial evidence." The Board held a public hearing and heard from individuals speaking on behalf of and against the proposed structure. Several residents supporting the special application spoke again of their concern about the increase in speeding through traffic and suspicious or criminal behavior. The owner of Corr Properties noted the increase in through traffic posing a danger to pedestrians, stating that "these vehicles have no association with Grand Oaks Community and are utilizing the roads as a highway." Another resident said the structure would functionally serve as an indicator to drivers that they are transitioning from an industrial-zoned area to a residential area, which would help indicate to drive more carefully. The resident expressed support for manning the guardhouse in the future if crime increases.

¶11.    The members of the Board discussed the potential efficacy of the guardhouse as a traffic-calming and security-enhancing feature. They discussed the problem of speeding vehicles being most prevalent at the Morris Street entrance to the neighborhood, and they talked about how the proposed location of the guardhouse is at an existing three-way stop,

6

where vehicles have already slowed down. They discussed the nearby presence of the new location of the Oxford police headquarters as an increased safety feature. Residents countered that the police headquarters would increase the number of people in the area who are not associated with the residential neighborhood or the country club and, therefore, would not necessarily resolve the residents' concerns of increased traffic and activity.

¶12. The owner of Corr Properties stated that his envisioned function of the guard shack would be to make criminals who were thinking about entering the neighborhood "pause and stop and think, wait a minute. I don't know if somebody is in there or not. Dark, tinted windows. Is somebody writing my tag down?" While the instant application did not include a request for a gate, the pros and cons of gating a public street were discussed. The owner of Corr Properties expressed support for gating public neighborhoods.

¶13. Members of the Board expressed concerns that the current proposal could lay the groundwork for adding gates to public streets in the future. The Planning Commission representative stated that "we [have], over the years, strived to create connectivity and transportation options throughout all of Oxford, and it's even one of the seven Oxford Guiding Principles to establish a densely connected network of streets, roads, that will guide future growth . . . and we believe that this request could potentially limit and deter that desired connectivity for Oxford."

¶14. Board members expressed uncertainty over who would sign the indemnity agreement that would hold the City harmless and how that responsibility would pass to a successor.

Additional discussion related to whether widening the public right of way would require changes to the subdivision plat, and whether other alternatives could be used to indicate the transition to a residential area, such as signage or a roundabout. The point was also raised that while some other residential neighborhoods have smaller unmanned structures near their entrances, the structures are located to the side on private land, not in the center of the municipal road.

¶15. The Board ultimately denied the special variance by a 4-3 vote.

*Appeal to Circuit Court*

¶16. Corr Properties appealed to the Circuit Court of Lafayette County.[7] Following a hearing, the circuit court affirmed the Board of Aldermen's denial of the special variance, holding that "because the point was fairly debatable, the zoning authority's action will not be disturbed." The court's order further states that the transcript of the Board's hearing "evidences not only that the issue was fairly debatable, but that it was actually debated by members of the Board and advocates for each side."[8]

¶17. Corr Properties appeals.

**DISCUSSION**

¶18. On appeal, Corr Properties argues that they met the requirements to receive the special

---

[7] *See* Miss. Code Ann. § 11-51-75 (Rev. 2019).

[8] As a threshold determination and while noting that neither party disputed that a special exception was required, the circuit court conducted a de novo review of the Board of Aldermen's interpretation of the Land Development Code, citing *Wheelan v. City of Gautier*, 332 So. 3d 851, 859 (Miss. 2022).

variance and that the project was in the public interest; therefore, the City's denial of the request was arbitrary and capricious. The City argues that the Land Development code does not confer a mandatory entitlement to receive a variance if certain conditions are met, and that the question of whether to grant the variance was fairly debatable. "The zoning decision of a local governing body which appears to be 'fairly debatable' will not be disturbed on appeal, and will be set aside only if it clearly appears the decision is arbitrary, capricious, discriminatory, illegal, or is not supported by substantial evidence." *City of Madison v. Shanks*, 793 So. 2d 576, 578 (¶7) (Miss. 2000) (quoting *City of Biloxi v. Hilbert*, 597 So. 2d 1276, 1280 (Miss. 1992)).

¶19.    "'Fairly debatable' is the antithesis of arbitrary and capricious. If a decision is one which could be considered 'fairly debatable,' then it could not be considered arbitrary or capricious." *Como Steak House Inc. v. Bd. of Sup'rs of Panola Cnty.*, 200 So. 3d 417, 425 (¶39) (Miss. 2016) (quoting *Shanks*, 793 So. 2d at 578 (¶8)). Applicants for a municipal zoning exception must prove that they have met all the required factors by a preponderance of the evidence. *Thomas v. Bd. of Sup'rs of Panola Cnty.*, 45 So. 3d 1173, 1188 (¶48) (Miss. 2010). "Because the governing body's decision carries a presumption of validity, 'the burden of proof is on the party asserting its invalidity.'" *Foster v. City of Pass Christian*, 117 So. 3d 658, 659 (¶5) (Miss. Ct. App. 2013) (quoting *Drews v. City of Hattiesburg*, 904 So. 2d 138, 140 (¶5) (Miss. 2005)); *see also Carroll v. City of Canton*, 296 So. 3d 751, 759 (¶23) (Miss. Ct. App. 2020).

9

¶20. We agree with the circuit court that the function and efficacy of the unmanned guardhouse were fairly debatable and, in fact, were thoroughly debated during the public proceedings before the Planning Commission and the Board of Aldermen. City officials and members of the public extensively discussed the traffic-calming goal and increased security needs. In the context of a zoning appeal, the "appellate court may not reweigh the facts nor may it substitute its judgment for that of the lower tribunal." *City of Olive Branch Bd. of Aldermen v. Bunker*, 733 So. 2d 842, 845 (¶16) (Miss. Ct. App. 1998); *see also Perez v. Garden Isle Cmty. Ass'n*, 882 So. 2d 217, 219 (¶6) (Miss. 2004)).

¶21. Moreover, "a decision is 'fairly debatable' when reasonable minds could differ on the propriety" of the decision. *AT&T Corp. v. Miss. Dep't of Info. Tech. Serv.*, 298 So. 3d 938, 946-47 (¶23) (Miss. 2020); *see also Jackson County v. Marcellus*, 383 So. 3d 348, 354 (¶26) (Miss. Ct. App. 2024). Here, opinions differed on whether the proposed structure would be effective for its stated purposes of traffic calming and increasing security, and on whether placing a visual barrier in the middle of a public right of way was in the spirit of the land development code's purpose of connectivity. The public and the Board also discussed whether the project might take the city in the direction of approving gates across public roads in the future, and whether this direction was in the public interest and spirit of the development code. Corr Properties argues that this consideration should be irrelevant since the special variance application was only for an unmanned guardhouse. It also notes that the special variance would be subject to a revocable license, leaving the City in control. At the

10

same time, the hearing transcripts demonstrate support by the applicants and some residents for gating the community and for manning the guardhouse.

¶22. The City argues that these policy concerns were appropriate to take into consideration when deciding whether to permit a privately owned guard house in the middle of an existing municipal street, and that taking these concerns into account is not arbitrary and capricious. "The terms 'arbitrary' and 'capricious' imply 'a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.'" *Robey v. Cleveland School Dist.*, 138 So. 3d 230, 234 (¶19) (Miss. Ct. App. 2014) (quoting *St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health*, 910 So. 2d 1077, 1082 (¶15) (Miss. 2005)). Here, the City was unaware of any similar previous requests to build a private guard house in the middle of a public street, and the City viewed it as an unusual request not necessarily contemplated by the development code. The City did not depart from settled controlling principles in denying the variance, and the denial was supported by substantial evidence.

## CONCLUSION

¶23. We will not overturn a City's denial of a zoning variance request when the issue is fairly debatable. Here, the record amply indicates that the question of whether to grant a special exception to erect an unmanned guardhouse in a public road was fairly debatable and was actually debated. The City's 4-3 decision to deny the zoning variance was not arbitrary and capricious. We therefore affirm the circuit court's order affirming the City of Oxford's decision.

¶24.  **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**